## Jackson v. Commonwealth.
(Decided Sept. 29, 1936.)

G. C. CLAY for appellant.

B. M. VINCENT, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

On a separate trial under an indictment charging her, Parthenia Crittenden, and Bessie Crittenden with the crime of infanticide, Helen Jackson was convicted, and her punishment fixed at life in the state reformatory.

On this appeal therefrom, she is insisting she was entiled to a directed verdict, the verdict is against the evidence and contrary to law, and the court erred in its instructions to the jury.

The basis of her argument that she was entitled to a directed verdict is, the evidence is insufficient to prove the corpus delicti.

It it true that

"In order to establish the corpus delicti, in a case of infanticide, it must be established that the child was born alive. In the absence of proof that the child had ever breathed or was alive at birth a conviction can not be sustained. It is necessary for the Commonwealth to prove affirmatively, not only that the child had breathed, because that might occur during birth, but that it had had a complete and seperate existence of its own after birth. Being born means that the whole body is brought into the world, and it is not sufficient that the child breathes in the progress of the birth. But if a child is fully brought forth from the body of its mother, and is killed while still connected by the umbilical cord, it is murder. When the evidence that the child was born alive is susceptible of doubt, a conviction can not be sustained."

Page 563, section 425, Roberson's New Kentucky Criminal Law and procedure (2d Ed.); State v. Williams, 52, N. C. 446, 78 Am. Dec. 248, and note on page 257; 29 C. J. sec. 5, p. 1050.

Her argument that the evidence is insufficient to sustain the verdict and that the latter is contrary to law is predicated on the same premise. A disposition of these questions calls for a review of the evidence.

About the 6th day of March, 1936, Archie Brock, Costello Brock, and Fred Jeffries were at a millpond in London, Ky. Costello Brock and Jeffries were fishing, when they noticed blood and some clothes on top of the water. The three boys with a limb dragged the

clothes into the bank, when they discovered "a little colored baby." They immediately went and got a man to come and look at it. The finding of the baby was reported to the sheriff of the county. He, with the coroner and a deputy, went to the pond and took charge of it. "It had a piece of cloth tied around its neck"; "it (the cloth) was kind of grayish looking"; "it had black and white on it." The coroner removed the baby from the water and later carried it to his office, when an investigation was commenced to ascertain and identify the mother of the child. Immediately, Helen Jackson, Parthenia Crittenden, and Bessie Crittenden were taken into custody by the officers, and Dr. O. D. Brock and Dr. J. W. Crook were called to make an autopsy to determine the cause of the child's death. Helen Jackson, Parthenia Crittenden, and Bessie Crittenden admitted the child had been born to Helen Jackson. At the time the coroner took possession of it, "it had a couple of cords tied around its neck." Helen Jackson admitted in the presence of the coroner and others that the piece of cloth was from her dress and that the child was born to her on Monday night before it was found on March 6th; that Parthenia Crittenden assisted her in its delivery; that she took it out of the room, and later came in and asked where she might find a piece of cord, when she (Helen Jackson) stated to her: "In my hat box."

Dr. Brock and Dr. Cook made an examination of the child. They removed its lungs and placed them in water. They floated on top of the water. At the time they examined the child the cord or cloth was wrapped around its neck "tightly, four or five times, and tied," sufficient to shut off the child's breath and produce death. Between the cords there was "a bulge of the skin and tissues." There was no water in the lungs, which indicated it was not drowned. The swelling of the tissues of the neck where the cord or cloth was tied indicated there was life in the tissues at the time, and after, it was tied. The physicians described the color of the child's lungs and gave it as their opinion that their color showed that the child had breathed after it was born. They agreed in the opinion that it died from strangulation produced by the cord or cloth tied around its neck.

Helen Jackson testified in her own behalf. She admitted the baby was hers. It was born to her at the

home of Parthenia Crittenden, and no one was present but her and Parthenia at its birth. She claimed that it did not cry or make a noise after it was born. She did not see Parthenia for about an hour after the baby was born. Parthenia did not pick it up.

Helen Jackson was further asked and answered as follows:

"Q. After the child was born what went with it, who had it? A. No answer. * * *

"Q. Who had it the last time you saw it? A. I did. * * *

"Q. Who took it down there to that mill pond, if it was taken there? A. No answer. * * *

"Q. Helen, that child was alive when it was born, wasn't it? A. No answer. * * *

"Q. Did you have it after it was born? A. Yes, sir.

"Q. What happened to it? A. No answer. * * *

"Q. Tell the jury what happened to that child? A. No answer. * * *

"Q. You know the baby was taken out of the house that night, do you know who took it out of the house, there was only two of you there? A. I took it out.

"Q. You were the one? A. I did. * * *

"Q. Helen, did you do anything to that baby, hurt it in any way? A. No answer. * * *

"Q. Did you tie a cord around the baby's neck? A. No, sir.

"Q. Do you know who did? A. It wasn't a cord. It was a scarf.

"Q. Who tied the scarf around its neck, do you know who done that? A. Yes, sir.

"Q. * * * Tell us the name of the person who did it, did you do it yourself? A. Yes, sir.

"Q. Why did you do it, Helen? A. No answer.

"Q. When you did it was that child dead or alive? A. It was dead, I guess.

"Q. Do you know whether it was dead or not? If you don't know, just say you don't know. If

you do know, say whether it was or not? A. I. don't know.

"Q. You don't know? A. No answer. * * *

"Q. Tell the jury how come you to tie that cord around its neck, it was alive when it was born,. wasn't it, Helen? A. I don't know.

"Q. Did you pick it up, if it wasn't alive how come you to tie that cord around its neck? A. No answer. * * *

"Q. Who tied that other cord around its neck? A. I don't know."

The testimony of the physicians, together with that of the accused, establishes beyond cavil, doubt, or question, the corpus delicti and Helen Jackson's guilt, and authorized and fully sustains the verdict of the jury. Her age is not disclosed by the record. It is admitted that the child was a bastard.

The coroner, over her objections, was permitted to express the opinion that the child died from strangulation. Not being a physician or a surgeon, he was not qualified to express his opinion, and the court improperly permitted him to do so. Whilst this statement of the coroner was incompetent and should not have been admitted, the evidence is so clear and positive that the child was born alive and afterwards strangled to death by the cord tied around its neck, it should be admitted that the erroneous admission of the above statement of the coroner, though incompetent, was and is not such a prejudicial error as to authorize or justify a reversal.

The instructions read:

"1. If you shall believe from the evidence,. beyond a reasonable doubt that the child mentioned in the evidence, was born actually wholly into the world, in a living state, separate and apart from the mother, and shall further believe from the evidence, beyond a reasonable doubt, that the defendant, Helen Jackson, thereafter killed and murdered said child, by choking it until it died, by the use of and tying cords and strings around its neck, or other devices, or by strangulation, and this was done wilfully, feloniously and of her malice aforethought by the said defendant, or, if you shall believe from the evidence beyond a reasonable doubt that the defendant, Parthenia Crittenden and Bessie Crittenden or

either of them did so do, and shall further believe from the evidence beyond a reasonable doubt that the defendant, Helen Jackson, was present at the time, near enough so to do and did wilfully, feloniously and of her malice aforethought, aid, abet, advise, encourage, incite. or command such choking, strangling and killing, then you will find the defendant, Helen Jackson, guilty as charged in the indictment, and fix her punishment at death or by confinement in the penitentiary of this state for life, in your discretion.

"II. If you shall have a reasonable doubt from the evidence of the defendant having been proven guilty, then you will find her not guilty.

"III. [a] The words 'wilfull' and 'wilfully,' as used in these instructions, means intentional, not accidental or involuntary.

"[b] The word 'feloniously,' as used in these instructions, means proceeding from an evil heart or purpose; done with the deliberate intention of committing a crime.

"[c] The phrase 'with malice aforethought,' as used in these instructions, means a predetermination to do the killing, without legal excuse, and it is immaterial as to what time before the killing such determination was formed."

A reading of the instructions in connection with the applicable principles in such case, as they are stated above, is sufficient answer to her criticism of the instructions. The instructions aptly and succinctly advised the jury of the law of the case.

Wherefore the judgment is affirmed.