Roy Lee JONES, Movant,

v.

COMMONWEALTH of Kentucky,
Respondent.

No. 91–SC–270–DG.

Supreme Court of Kentucky.

March 12, 1992.

As Amended April 30, 1992.

Rehearing Denied June 25, 1992.

C. Thomas Hectus, Mitchell L. Perry,
Williams & Wagoner, Louisville, for movant.

Chris F. Gorman, Atty. Gen., Michael L.
Harned, Asst. Atty. Gen., Frankfort, for
respondent.

LEIBSON, Justice.

Movant, Roy Lee Jones, pled guilty to
second-degree manslaughter and was sentenced to six years' imprisonment. His
plea was conditional, as provided for in RCr
8.09. He reserved the right to appeal the
order denying his motion to dismiss the
indictment in which he argued that our
manslaughter statute, KRS 507.040, does
not encompass death caused by prenatal
injuries. KRS 507.040 specifies that manslaughter in the second degree occurs
when one "wantonly causes the death of
another person." The issue here is whether the victim fits within the description of
"another person," as used in the statute.

On June 4, 1989, movant, while driving under the influence of alcohol, collided with another vehicle driven by Kimberly Lynch, who was 32 weeks pregnant at the time. Five hours later the baby was delivered by caesarean section, and 14 hours after delivery the baby died from prenatal injuries sustained in the motor vehicle collision.

In the matter-of-right appeal to the Kentucky Court of Appeals, Jones argued for the same result we reached in *Hollis v. Commonwealth*, Ky., 652 S.W.2d 61 (1983), in which we held that a criminal assault upon a pregnant mother, causing the death of a viable fetus, could not support a murder indictment. The rationale in *Hollis* was that "destroying the life of a viable fetus was not considered murdering a person at common law and that the statutory definition of murder did not enlarge the scope of the word 'person.'" *Id.* at 62. Jones also relied on *Jackson v. Commonwealth*, 265 Ky. 295, 96 S.W.2d 1014 (1936), in which our Court dismissed a murder indictment where the evidence was insufficient to establish "that the child was born alive."

The Court of Appeals affirmed Jones' conviction, and he then sought and was granted further review in this Court. The issue before the Court of Appeals, and the issue now before our Court, is whether the facts here call for the same results as in *Hollis* and *Jackson*, or whether there is a critical factual difference between this case and those cases that changes the results. Here, as in the *Hollis* and *Jackson* cases, the criminal conduct alleged was committed before the fetus was delivered. Here, unlike the *Hollis* and *Jackson* cases, the baby was born alive and died subsequently. The Court of Appeals held the present scenario sustains indictment and conviction for criminal homicide. We affirm.

KRS Chapter 507 of the Kentucky Penal Code covers the various offenses constituting "Criminal Homicide." In each offense the elements of the crime include both certain specified criminal conduct *and* necessary consequences. Both conduct and consequences are essential to convict of the crime, but they are not interdependent. In this case the conduct must have been wanton and the consequence must have been the death of a person. The *mens rea* involved in committing involuntary manslaughter covers the mental state of the actor at the time when the criminal act is committed, but the *mens rea* does not require the actor intend the death of a particular person, or any person; it is only necessary that the consequence of the criminal act, immediate or subsequent, is the death of a person. The quality of the act is measured by the nature of the conduct; whether the victim is a "person" is a separate element of the offense that depends on the victim's status at the time when death occurs. The statute specifies the act must result "in the death of a person," but the statute does not specify that the victim must have reached a state of development that fits the legal definition of a "person" at the time the injury is inflicted.

Because the General Assembly had failed to define "person" in the Criminal Homicide statutes, in *Hollis* we assigned to the word "person" the common law meaning of the term in place when the Penal Code was drafted. We accepted as a working premise that this was the meaning the General Assembly intended because it did not redefine "person" in the criminal homicide statutes. We did not presume to address either metaphysical or medical questions regarding when life begins in *Hollis*, nor do we do so now. Our task is limited to construing legislative intent by time-honored means; in the absence of a statutory definition, this means we look to common law precedent and to the Model Penal Code drafted by the American Law Institute which was the source of the 1974 Kentucky Penal Code. *See* Lawson, *Criminal Law Revision in Kentucky. Part I—Homicide and Assault*, 58 Ky.L.J., 242 (1969–70). In the present case we look once again to these same sources, but they lead us to a different result.

When we look to the legal definition of a "person" as used at common law in criminal homicide cases we find that the fact of birth is what distinguished feticide from infanticide. The Commonwealth has cited

us to no less authority than Coke and Blackstone to prove the point. 3 Coke, *Institutes*, 50 (1648). IV *Blackstone's Commentaries* 198 (Sharswood ed. 1860, Vol. II at 464). Blackstone states, in pertinent part:

"Further, the person killed must be 'a reasonable creature in being....' To kill a child in its mother's womb is now no murder, but a great misprison: but if the child be born alive and dieth by reason of the potion or bruises it received in the womb, it seems, by the better opinion, to be murder...."

Of course, this is the *same* definition we assigned to the term "person" in the *Hollis* case. But when we use that definition here the factual difference is critical. In *Hollis*, the criminal act resulted in the death of a fetus; indeed, even worse, the assault on the mother was intended to destroy the fetus. Nevertheless it was a fetus, albeit a viable fetus, that was killed, and not a "person" as that term was used in stating the elements of murder at common law. In *Hollis*, we recognized that at common law a viable fetus was not considered a legal person for the purpose of "status as a victim of criminal homicide" until "there was evidence sufficient to establish that the child was born alive." 652 S.W.2d at 62. Here, the victim was a fetus when the criminal act occurred, but a person when death occurred, so the criminal act resulted in the death of a person. *Hollis* recognized we were bound by the common law principle enunciated in *Jackson*, and refused to "expand the class of persons who could be treated as victims of criminal homicide." *Id.* at 63. Likewise, we apply, but do not "expand the class of persons," by this Opinion. The status of the victim as a person at the time when death occurred supplies the final element necessary to the crime of second-degree manslaughter, i.e., the wanton act caused the death of a person (KRS 507.040).

The Court of Appeals' Opinion included persuasive authority in point from sister states which have reached the same result. In *Williams v. State*, 316 Md. 677, 561 A.2d 216 (1989), the Maryland court held that criminal infliction upon a pregnant woman of prenatal injuries resulting in the death of her child after live birth sustained a conviction for manslaughter. The court said:

"State courts which have applied the common law in situations similar to that now before us have uniformly applied the Coke–Blackstone 'born alive' rule. They have concluded ... that criminal infliction upon a pregnant woman of prenatal injuries resulting in the death of her child after live birth may constitute manslaughter." 561 A.2d at 219.

*People v. Bolar*, 109 Ill.App.3d 384, 64 Ill.Dec. 919, 440 N.E.2d 639 (1982), involves facts markedly similar to the present case. A woman eight months pregnant was a passenger in a car struck by the defendant's vehicle when he failed to stop at an intersection. Because of injuries sustained from the accident, doctors were forced to deliver the baby by caesarean section. The baby lived for a few minutes after delivery. The doctors testified that the collision caused the baby's prenatal injuries which in turn caused death after birth. The defendant's conviction for reckless homicide was upheld on appeal.

In *State v. Hammett*, 192 Ga.App. 224, 384 S.E.2d 220 (1989), another vehicular homicide case, the baby was born and lived approximately 11 hours before dying from injuries he had received in the accident. The Georgia court rejected the same argument advanced by the appellant in this case, that some intentional or reckless act *subsequent* to the child's birth must exist in order to sustain a conviction for criminal homicide, stating:

"... it is not the victim's status at the time the injuries are inflicted that determines the nature of the crime ..., but the victim's status at the time of death which is the determinative factor." 384 S.E.2d at 221.

In *Hollis v. Commonwealth, supra*, after taking note that the Commentary to KRS Chapter 507 "refers repeatedly" to the Model Penal Code, we quote from the Commentary to the Model Penal Code, as follows:

"The effect of this language is to continue the common-law rule limiting criminal homicide to the killing of one who has been born alive. Several modern statutes follow the Model Code in making this limitation explicit. Others are silent on the point, but absent express statement to the contrary, they too may be expected to carry forward the common-law approach." 652 S.W.2d at 61.

The movant argues that unless a criminal statute provides notice that he might be committing a criminal act toward this victim, it is void for vagueness under constitutional due process principles. These principles only require that the language of a criminal statute be sufficiently precise to provide a fair warning, when measured by common understanding, that certain *actions* are unlawful, not that the offender must be able to measure the consequences when he commits the act. *See Hardin v. Commonwealth*, Ky., 573 S.W.2d 657 (1978) and *Anderson v. United States*, 215 F.2d 84 (6th Cir.1954), cited in the Kentucky Court of Appeals' Opinion herein.

In driving his vehicle while intoxicated, movant could be found to have acted wantonly in circumstances that caused the death of another person. KRS 501.020(3); KRS 507.040. Protection against constitutionally impermissible vagueness does not require that the accused know the consequences of his act when he ran his car into another one. He need not know there was a woman inside who was pregnant and might deliver a baby which would live for 15 hours before dying as a result of the injuries he inflicted. Involuntary manslaughter does not require a specific intent to kill. The offender need not know who or how many are in the other car in order to be charged and found guilty. He has fair warning against the wantonness of conduct which threatens lives. *See generally:* W. LaFave & A. Scott, *Criminal Law*, note 122 at 95 (1972). The "void-for-vagueness" doctrine only "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983).

In *Hardin v. Commonwealth, supra,* we said, "we must take a 'man on the street' approach to normal activities. Has the statute defined what can or cannot be done with such clarity that persons upon whom it is designed to operate can understand it?" And in *O'Leary v. Commonwealth*, Ky., 441 S.W.2d 150, 155 (1969), we held that "a criminal law is not unconstitutional merely because it throws upon people the risk" of anticipating the results of their conduct. The "void-for-vagueness" doctrine does not address the present situation because it is clear what conduct is prohibited.

It is a necessary caveat to this Opinion to specify certain limitations on its rationale. We have addressed only criminal homicide offenses which, while now codified in KRS Chapter 507, were heretofore addressed by the common law. We do not address new offenses, such as criminal child abuse, which were not common law offenses, and for which the common law provides no similar legal precedent. The limit of this case as authority does not extend beyond the definition of a "person" where the term appears, undefined, in the Criminal Homicide statutes.

Murder and manslaughter are criminal acts that result in the death of a "person" (KRS 507.020, .030, .040), and neither the common law nor our statutes requires "person" status at the time the act occurred. Appellant wantonly caused the death of 15–hour old Whitney Leigh Lynch by inflicting prenatal injuries upon her. The common law, *Jackson v. Commonwealth, supra,* ample precedent found in the decisions from sister states, and the background of the Kentucky Penal Code all illustrate Kentucky's criminal homicide statutes encompass this sort of victim. The Court of Appeals correctly affirmed appellant's conviction.

The Court of Appeals' decision is affirmed.

STEPHENS, C.J., and COMBS, LEIBSON and SPAIN, JJ., concur.

LAMBERT, J., concurs by separate opinion in which REYNOLDS and WINTERSHEIMER, JJ., join.

WINTERSHEIMER, J., concurs by separate opinion in which REYNOLDS, J., joins.

LAMBERT, Justice, concurring.

In my view, the reliance of the majority on the "born alive" doctrine is misplaced. I view the distinction between this case and the decision in *Hollis v. Commonwealth*, Ky., 652 S.W.2d 61 (1983), as artificial and without a logical basis.

In *Hollis*, the Court held that the fetus was not a person and that the killing of the fetus was not murder. In this case, however, the majority has held that wanton injury to a fetus may be homicide if the fetus is born alive and thereafter succumbs. The effect of this is to "wait and see" whether a crime has been committed.

The underlying criminality of an act must be determined as of the time the act is committed. For example, the act of intentionally causing physical injury to another person is then a crime whether the result is only slight injury (assault in the fourth degree) or serious physical injury (assault in the second degree). While a determination of the specific crime may await the result of the criminal act (assault may become murder if the victim dies), a determination of whether any crime has occurred may not be so deferred.

In my view, this case cannot be harmonized with *Hollis*. Here, as in *Hollis*, the criminal conduct was committed against a viable fetus and in each case, the act was then a criminal act or it was not. We should take this opportunity to overrule *Hollis v. Commonwealth, supra,* and abandon its restrictive definition of the word "person," a definition not remotely compelled by legislative history, rules of statutory construction, or persuasive authority from other jurisdictions. See *Hollis v. Commonwealth*, Wintersheimer, J., dissenting. We should hold that a viable fetus enjoys full protection of the criminal

law and that the terms "person" and "human being" include viable unborn children.

I concur with the result of the majority opinion but on the grounds set forth herein.

Reynolds and Wintersheimer, JJ., join in this concurring opinion.

WINTERSHEIMER, Justice, concurring.

I concur in the result which affirms the decision of the Court of Appeals and the circuit court, but I do not agree with the limited approach to the question of personhood.

I must agree with the concurring opinion rendered by Court of Appeals Judge Michael McDonald because the majority opinion achieves the right result but does not go far enough in examining the common law or Kentucky law.

K.R.S. 507.040 provides in part that a person is guilty of manslaughter and in the operation of a motor vehicle, he wantonly causes the death of another person. K.R.S. 500.080(12) clearly indicates that person, under the Kentucky statutes, means "a human being." K.R.S. 507.010 also provides that a person is guilty of criminal homicide when he causes the death of another human being.

I believe there is sufficient definition in the Penal Code so as to preclude the invocation of the common law.

Counsel for Jones correctly frames the issue in the brief when he says, "The question presented in this case is whether Kentucky's Penal Code requires that, at the time of the criminal act, the victim must already be a 'human being,' or whether some trauma inflicted upon a nonhuman being, i.e. a fetus, can sustain a conviction for homicide." Jones argues that there is no question that a fetus is not a "person" as the word is used in the context of the criminal statutes. Jones cites *Hollis v. Commonwealth*, Ky., 652 S.W.2d 61 (1983) as his supporting case authority.

The fact that the deceased child was born alive is only a way station on her brief tragic journey of existence. As far as it goes, the majority opinion is adequate.

However, a complete analysis of the statutes involved requires recognition of the fact that a person under Kentucky law actually means a human being and that it makes little difference whether the death occurred before or after birth because the offense was the killing of one human being by another. Such an offense has long been denounced by Kentucky criminal law.

My perception of the arguments presented here, both in the briefs and at oral argument indicates that the Attorney General clearly states that the holding of *Hollis, supra,* has no application. Jones argues that this Court stated in *Hollis* that the application of the homicide statute to a viable fetus would necessarily render the statute vague in that there would be no "objective legal standard for deciding if the accused knew he was terminating the life of a viable fetus." *Hollis* at p. 64. The majority here states that a viable fetus is not a person as that term is used in stating the elements of murder at common law. It attempts to justify the *Hollis* holding. I must respectfully but totally disagree with that limited analysis of the common law. A search of the 9–page majority opinion does not reveal the use of the phrase "human being." Webster's New 20th Century Dictionary, unabridged, 2nd Ed. (1977) defines "human" as a human being with the characteristics of a person. There is little doubt that the words "person" and "human being" are synonymous. Common law principles have been in existence for centuries. However, application of the common law is a dynamic and expanding area.

Our consideration of the term "person" here should take us to any standard dictionary. All of the definitions relate to the term "person" in terms of a human being. The word "birth" or anything relating to birth is never mentioned, either directly or indirectly, in any of the numerous definitions of "person" or "human being." *See* "The Right to an Abortion," Prof. John Gorby, Southern Illinois Law Journal, Vol. 1979 No. 1.

The civil law has long recognized that the unborn child is a "person." *See Bonbrest v. Kotz,* 65 F.Supp. 138 (D.C.Cir. 1946). The civil law and the law of property regard a child "en ventre sa mere," as a human being from the moment of conception.

42 Am.Jur.2d *Infants* § 2, states that biologically speaking, the life of a human being begins at the moment of conception in the mother's womb and as a general rule of construction in the law, a legal personality is imputed to an unborn child for all purposes which would be beneficial to the infant after its birth. An unborn child at the time of the death of its parent has also been considered a "child" of the decedent in determining beneficiaries of an award in a wrongful death action or in a worker's compensation case.

Prosser's 4th Edition, published in 1971, summarizes the criticism of various judicial denials of recovery to the child. Prosser maintained that medical authority has long recognized that the child is in existence from the moment of conception and for many persons its existence is recognized by the law. The criminal law regards it as a separate entity and the law of property considers it in being for all purposes which are to its benefit, such as taking by will or descent. *Cf.* W. Prosser, *Handbook of the Law of Torts* (4th Ed.1971) pp. 336. In 1984, Prosser and Keaton noted that viability does not affect the question of the legal existence of the unborn. Prosser and Keaton on Torts (5th Ed.) § 55, p. 369.

Kentucky case law has followed such developments. This Court in 1955 stated that, "The most cogent reason, we believe, for holding that a viable unborn child is an entity within the meaning of the general word 'person' is because, biologically speaking, such a child is, in fact, a presently existing person, a living human being." *Mitchell v. Couch,* Ky., 285 S.W.2d 901 (1955). *Also see Cox v. Cooper,* Ky., 510 S.W.2d 530 (1974); *Rice v. Rizk,* Ky., 453 S.W.2d 732 (1970).

The New Jersey Supreme Court not only recognized the personhood of the unborn child, but held that the right to life prevailed over constitutionally protected religious beliefs of the mother who had reject-

ed a blood transfusion. *Raleigh Fitkin–Paul Morgan Memorial Hospital v. Anderson,* 42 N.J. 421, 201 A.2d 537, cert. den. 377 U.S. 985, 84 S.Ct. 1894, 12 L.Ed.2d 1032 (1964).

As observed by Dr. Seuss in the popular children's story *Horton Hears a Who,* it is abundantly clear that "A person is a person no matter how small."

The English common law of property has long recognized the unborn child as an autonomous human being. Accordingly, it simply mirrors the basic proposition that in law, as in ordinary affairs and language, the word "child" includes the conceived but as yet unborn child. In 1795 an English court interpreted the ordinary meaning of children in a Will to include a child in the womb. *"En ventre sa mere* who by the course and order of nature is then living, comes clearly within the description of children living at the time of the decease." *Doe v. Clark,* 2H Bl. 399, 126 Eng.Rep. 617 (1795). Thereafter, other courts rejected the contention that this was a mere fiction of construction. "Why should not children *en ventre sa mere,* which means in its mother's womb, be considered in existence? They are entitled to all the privileges of other persons." *Thelluson v. Woodford,* 4 Ves. 227, 31 Eng.Rep. 117 (1798).

This brief review of the common law as it was applied in the 19th Century shows a desire to protect the unborn and demonstrates a continuing and almost universal concern about unborn human life. No real distinction can be made among the various stages of developing human life, before birth, or between prenatal or post-natal life. The separation of person from the concept of human being is completely artificial. Once human life has commenced, the constitutional protections found in the Fifth and Fourteenth Amendments to the Federal Constitution impose upon the state the duty of safeguarding it. *Steinberg v. Brown,* 321 F.Supp. 741 (D.C.Ohio, 1970)

Any historically correct interpretation of the Fourteenth Amendment to the Constitution should include the statement of its prime sponsor in the House of Representatives in 1865, Ohio Congressman John A. Bingham, who noted that the amendment was universal and applied to any human being. Congressional Globe, 39th Congress, 1st session, 1089 (1866).

Common law crimes were abolished in Kentucky when the penal code was enacted and a liberal construction of the Kentucky law was mandated. The Kentucky penal code is based on and frequently refers to the model penal code. The model code indicates that for purposes of homicide, a human being means a person who has been born alive. ALI, Model Penal Code, 1962. It is reasonable to say that this definition was considered by the drafters of the Kentucky Code but was not adopted. Consequently, I must conclude that the commentary reflects a legislative intent not to consider the concept of being born alive as previously followed to apply to the new Kentucky Penal Code.

An analysis of the common law in this situation is required only because the legislature has not yet defined the word "person." The General Assembly did indicate that the provisions of the penal code should be liberally construed. Their purpose was to repudiate the common law principle of a strict construction of the penal laws. *Cf.* my Dissent in *Hollis,* pp. 67 and 68.

If additional definition is required the legislature could define person and end the controversy. Legislatures in several states have modified the common law born-alive rule by enacting statutes which establish criminal penalties for the murder of an unborn child. California, Florida, Illinois, Mississippi and Oklahoma are among the state legislatures that have so acted. In South Carolina and Massachusetts, the courts have recognized feticide in the absence of any specific statute. *Commonwealth v. Cass,* 392 Mass. 799, 467 N.E.2d 1324 (1986); *State v. Horne,* 282 S.C. 444, 319 S.E.2d 703 (1984).

As noted in the *Hollis* dissent, the existence of life in an unborn child at the stage of development of 28 weeks is a fundamental truth that does not require sophisticated interpretation. The legislature, as well as the public in general, should have reasonable acquaintance with the civil laws of

Kentucky. It is a frequent presumption that the General Assembly is aware of the law at the time it adopts any other law. Consequently, it is reasonable to infer that the Kentucky Legislature intended the concept of personhood to be extended to the criminal law.

A further analysis of the historical background of the common law in general in regard to the question of person and human being indicates that the early scientific understanding relating to life was based on the theory of Aristotle who identified life with the animation of a formed fetus. Aristotle, *History of Animals*, § .7.3583b. By the middle of the 17th Century, the beginning of an actual human life was equated with movement or "quickening" when the mother first felt the unborn child move in her womb. Consequently, the English common law established criminal penalties for the death of an unborn child after quickening. Lord Coke was recognized by Blackstone in 1769 in his famous commentaries on the laws on England to the effect that life begins in contemplation of the law as soon as an infant is able to stir in the mother's womb. Blackstone, *Commentaries on the Laws of England*, 124 (1769).

Medical science has made some advances since the 17th Century and we now realize that the child moves long before the mother feels quickening. The movement theory is relevant to the objective development or gestation of the child because it depends primarily on subjective impressions by the mother. Understandably our ancestors had to judge by the best information available to them at the time and so they protected unborn life under the criminal law from the period of quickening forward which coincided with their comparatively primitive, scientific understanding of what they believed was the time when individual life actually began.

It was only in the second half of the 19th Century that biological research advanced to the extent of understanding the actual mechanism of human reproduction and what really comprised the onset of gestational development. The mammalian egg was not identified until 1827. The cell was first recognized as the structural unit of organisms in 1839 and the egg and sperm were recognized as cells in the next two decades. *See* L. Arey *Developmental Anatomy: A Textbook and Laboratory Manual of Embryology* (6th Ed.1954). This new research at the time convinced medical personnel that the old quickening distinction embodied in the common law and some statutory codes was unscientific and indefensible. *See* R. Sauer, *28 Population Studies 53* (1974). We can learn from the mid–19th Century that a reasonable analysis of the laws indicated that the safety of the unborn child was a major concern of many medical and legal scholars. Although a number of early state laws contained a distinction based on quickening which gave a lower value to early fetal life, the large majority of state laws never made this distinction and most of these laws referred to a woman as "being with child" or some similar phrase which attributed a human status to the unborn child. *See* J. Moore *The Origins and Evolution of National Policy* (1978).

Consequently, I concur in the result achieved by the majority in affirming the Court of Appeals and the circuit court. I submit this concurring opinion to give a more complete analysis and review of the concept of person and human being in our society and in the law.

REYNOLDS, J., joins in this concurring opinion.