**COMMONWEALTH of Kentucky, Movant,**

v.

**Connie WELCH, Respondent.**

**No. 92–SC–490–DG.**

Supreme Court of Kentucky.

Sept. 30, 1993.

Chris Gorman, Atty. Gen., Michael L. Harned, Asst. Atty. Gen., Crim. Appellate Div., Frankfort, for movant.

Sara L. Mandelbaum, Isabelle Katz Pinzler, Women's Rights Project, American Civ. Liberties Union, New York City, Michael J. Curtis, Ashland, for respondent.

LEIBSON, Justice.

Connie Welch was arrested on November 7, 1989, when police, while executing a warrant at the home of a suspected drug dealer, found Welch in possession of oxycodone, a Schedule II narcotic, and syringes. Welch was under the influence of the oxycodone, having just injected some into her jugular vein. Because she was eight months pregnant when arrested, she was not taken into custody but simply given a date to appear in court.

On December 1, 1989, Welch gave birth to a son. Because Welch informed the attending physician of her continued drug dependency, even after arrest, he admitted the baby to the neonatal intensive care unit to be observed for neonatal abstinence syndrome. The toxicology report was negative for oxycodone, but positive for nicotine and caffeine.

The baby was born full term, without birth defects, and his size and weight were appropriate for his gestational age. Further, there was no evidence the baby was going to have a long-term disability, but the baby suffered from symptoms diagnosed as neonatal abstinence syndrome attributed to the baby having become passively addicted to drugs by being exposed through the mother's drug abuse during pregnancy. When the baby was delivered the drug supply was cut off by the act of severing the umbilical cord. The symptoms were: mild temperature, irritable, tremulous and jittery, cried a lot, and some mottling of the skin. Neonatal abstinence syndrome carries with it the possibility of much more serious complications which did not occur, including convulsions and seizures which could cause the cessation of breathing and result in permanent brain damage or death. The baby was released to its mother on December 11, 1989, in good health.

On January 11, 1990, the Boyd County Grand Jury returned an indictment charging Welch with criminal abuse in the second degree (KRS 508.110), possession of a Schedule II narcotic (KRS 218A.990(7)), and possession of drug paraphernalia (KRS 218A.990(15)). The criminal abuse count, as amended, alleged the baby had suffered neonatal abstinence syndrome and the "abuse" continued up through and including December 11, 1989, when Welch and the baby were released from the hospital.

On May 23, 1990, Welch was found guilty of all charges. She was sentenced to two years for possession of a controlled substance, plus five years for criminal abuse in

the second degree, to run consecutive with each other for a total of seven years, plus twelve months for possession of drug paraphernalia (a misdemeanor) to run concurrent with the felony sentences.

The Court of Appeals affirmed her convictions for possession of a controlled substance and of drug paraphernalia, and vacated her conviction on the criminal abuse charge. We granted the Commonwealth's petition for review of that portion of the opinion reversing the criminal abuse charge. For reasons to be stated, we affirm the decision of the Court of Appeals.

Welch's counsel presents various arguments as to why the criminal abuse statute, KRS 508.110, does not apply to the present fact situation: (1) under the authority of *Hollis v. Commonwealth*, Ky., 652 S.W.2d 61 (1983) and *Jones v. Commonwealth*, Ky., 830 S.W.2d 877 (1992), a fetus is not a "person" as that word is used in KRS 508.110, the criminal abuse statute used to prosecute Welch; (2) construing KRS 508.110 to cover the present fact situation violates the statute's intent; (3) the statute so construed violates the due process guarantee of fair notice, i.e., it would be unconstitutionally vague; (4) the statute so construed operates as a constitutionally impermissible *ex post facto* law; and (5) the prosecutor's application of the statutes leads to results that are irrational and counterproductive of legislative intent as expressed through H.B. 192, Ch. 442, 1992 Acts, the Maternal Health Act.

The Court of Appeals limited its opinion to the first of these arguments, finding that our decision in the *Hollis* case was controlling and excluded abuse of a fetus from the purview of the criminal abuse statute, albeit the fetus was later born alive and suffered from symptoms causally related to the mother's previous drug abuse. Of course, the facts in *Hollis* differed from the present case in several respects: (1) *Hollis* was a criminal homicide case, not a child abuse case; (2) the injury to the fetus in *Hollis* was caused by a third party's assault on the mother, not by the mother's self-abuse; and (3) the baby was born dead, whereas here the baby was born alive.

The Commonwealth argues that on this grant of discretionary review we should consider none of the arguments the defense has presented against the scope of the statute except how to apply *Hollis,* because this was the issue the Court of Appeals discussed in reaching its decision and Welch did not undertake to cross-appeal. However, the issue decided by the Court of Appeals and now before us is whether the criminal abuse statute applies to the present fact situation, and we must consider those arguments essential to deciding this issue. The arguments presented are different aspects of the same issue rather than separate issues. Indeed, the Commonwealth is the first to expand the scope of the argument over how *Hollis* applies here. It does so by taking up this Court's opinion in *Jones v. Commonwealth, supra,* published after the Court of Appeals rendered its opinion in this case, as a gloss on *Hollis.*

We turn first to the Commonwealth's approach to the *Hollis* and *Jones* cases. Hollis had forced his hand up his pregnant wife's vagina, thereby killing the fetus and substantially damaging the wife's uterus and vagina. We held, however regrettable it may be, that Hollis could not be charged with murder even though he intentionally killed a viable fetus, because the definition of who was a "person" under the common law as it pertained to murder applied to the criminal homicide statutes in the absence of a new statutory definition. Common law murder was limited "to the killing of one who has been born alive. (652 S.W.2d at 63)." We held that Kentucky, in adopting the Model Penal Code (1962) published by the American Law Institute, embraced the Model Penal Code Commentary on this subject, which states:

"... absent express [statutory] statement to the contrary, '[statutes following the Model Code] may be expected to carry forward the common-law approach." *Id.*

Applying *Hollis* to the present case, the Court of Appeals reasoned that criminal abuse of a fetus, like murder of the fetus, is not punishable as a discrete criminal offense separate from the crime committed against

the mother, however morally reprehensible it may be. The Court of Appeals stated:

"Albeit the facts in *Hollis* involve a murder prosecution, the rationale remains the same: The courts cannot presume a legislative intent to expand the class of persons treatable as victims of criminal activity."

The Commonwealth attacks this conclusion because in this instance the baby was born alive and the effects of past criminal activity caused the baby to suffer *postpartum* from neonatal abstinence syndrome. While this condition was treatable and temporary, it could have caused permanent brain damage or death. KRS 508.110, second-degree criminal abuse, only requires abuse of "another person of whom [the offender] has actual custody" which "(b) places him in a situation that may cause him serious physical injury." The purpose of the statutes on "criminal abuse" (KRS 508.100, .110, and .120) is to criminalize serious physical abuse of children twelve or less by a custodial person, although their scope includes others who are "physically helpless or mentally helpless." They are commonly known as the criminal child abuse statutes.

The Commonwealth points out that our opinion in *Jones* explains that the *Hollis* opinion calls for a different result where the baby is born alive and dies later from prenatal injuries, because the common law on criminal homicide further recognized that "if the child be born alive and dieth by reason of the potion or bruises it received in the womb, it seems, by the better opinion, to be murder." *Jones,* 830 S.W.2d at 879, quoting *Blackstone's Commentaries.*

In *Jones,* we held that a drunk driver could be convicted of second-degree manslaughter for causing a motor vehicle collision injuring a pregnant woman whose baby then died postpartum from prenatal injury. To the extent that the baby in the present case suffered from a postpartum condition from prenatal causes, superficially the *Jones* decision suggests that Welch could be prosecuted for second-degree criminal abuse based on her prenatal criminal activity. But the similarity to *Jones* stops here. The rationale behind both *Hollis* and *Jones* was that this Court would "not presume to address either

metaphysical or medical questions regarding when life begins (830 S.W.2d at 878)," but simply apply the common law meaning of the word "person" in criminal homicide cases in the absence of a different statutory definition. Because the common law decided the question whether a person was a victim of criminal homicide on the basis of whether the victim was born alive, and the General Assembly has not decreed otherwise, we deemed it appropriate to follow the Commentary to the Model Penal Code from which our criminal homicide statutes derive, reasoning the General Assembly intended to draw the line at the same place.

But the common law offers no similar line of demarcation for criminal child abuse, because, of course, it was not a common law crime in the first place. Thus we must look elsewhere to determine the meaning of "person" under the criminal child abuse statutes. Indeed, to avoid lower courts applying *Hollis* and *Jones* to other situations where the common law provides no precedent, *Jones* stated:

"It is a necessary caveat to this Opinion to specify certain limitations on its rationale. We have addressed only criminal homicide offenses which, while now codified in KRS Chapter 507, were heretofore addressed by the common law. We do not address new offenses, such as criminal child abuse, which were not common law offenses, and for which the common law provides no similar legal precedent." 830 S.W.2d at 880.

When we look for valid reasons upon which to decide this case, we find two separate problems raised by the facts.

The first problem is the same as in *Hollis* and *Jones:* did the General Assembly intend to include within the scope of the criminal abuse statutes prenatal abuse causing injury which carries over the postpartum state? To further complicate this first issue, here the particular mode of abuse, the mother's use of drugs, was *not* a direct cause of postpartum injury but an indirect cause: it was the *withdrawal* of drugs to which the baby had become passively addicted, rather than the *absorption* of these drugs, which was the imme-

diate cause of the baby's neonatal abstinence syndrome.

We will not undertake to engage the complexities of this first problem because the second problem is dispositive of the case. The second problem is: did the General Assembly intend to include prenatal injury from a pregnant woman's self-abuse as well as injury inflicted by a third person? In *Hollis* and *Jones* the neonatal injury was caused by a blow administered by an outsider; the issue here is the mother's self-abuse, which also had the effect of transmitting drugs to the baby through the umbilical cord.

The mother was a drug addict. But, for that matter, she could have been a pregnant alcoholic, causing fetal alcohol syndrome; or she could have been addicted to self abuse by smoking, or by abusing prescription painkillers, or over-the-counter medicine; or for that matter she could have been addicted to downhill skiing or some other sport creating serious risk of prenatal injury, risk which the mother wantonly disregarded as a matter of self-indulgence. What if a pregnant woman drives over the speed limit, or as a matter of vanity doesn't wear the prescription lenses she knows she needs to see the dangers of the road? The defense asks where do we draw the line on self-abuse by a pregnant woman that wantonly exposes to risk her unborn baby? The Commonwealth replies that the General Assembly probably intended to draw the line at conduct that qualifies as criminal, and then leave it to the prosecutor to decide when such conduct should be prosecuted as child abuse in addition to the crime actually committed.

However, it is inflicting intentional or wanton injury upon the child that makes the conduct criminal under the child abuse statutes, not the criminality of the conduct *per se*. The Commonwealth's approach would exclude alcohol abuse, however devastating to the baby in the womb, unless the Commonwealth could prove an act of drunk driving; but it is the mother's alcoholism, not the act of driving that causes the fetal alcohol syndrome. The "case-by-case" approach suggested by the Commonwealth is so arbitrary that, if the criminal child abuse statutes are construed to support it, the statutes transgress reasonably identifiable limits; they lack fair notice and violate constitutional due process limits against statutory vagueness. As stated recently and persuasively by a Pennsylvania trial court in a case factually similar to this one:

> "If the statutes at issue are applied to women's conduct during pregnancy, they could have an unlimited scope and create an indefinite number of new 'crimes.' ... In short, the District Attorney's interpretation of the statutes, if validated, might lead to a 'slippery slope' whereby the law could be construed as covering the full range of a pregnant woman's behavior—a plainly unconstitutional result that would, among other things, render the statutes void for vagueness. *Commonwealth v. Kemp*, No. 2707 C 1991, Common Pleas of Westmoreland County, Pa. Criminal Division, Sl. Op. at p. 12."

The defense cites other decisions to the same effect in expectant mother prenatal drug abuse cases from trial courts in New York and Michigan, and from appellate courts in Ohio (*State v. Gray*, 62 Ohio St.3d 514, 584 N.E.2d 710 (1992)), California (*Reyes v. Superior Court*, 75 Cal.App.3d 214, 141 Cal.Rptr. 912 (1977)), and Florida (*Johnson v. Florida*, 602 So.2d 1288 (Fla.1992)). All of these cases address statutes similar in effect to the present one, and all conclude that, properly construed, the statutes involved do not intend to punish as criminal conduct self-abuse by an expectant mother potentially injurious to the baby she carries. All of these cases point out in one way or another that to construe the statute involved otherwise makes it impermissibly vague, and that if their state legislature intended to include a pregnant woman's self-abuse which also abuses her unborn child within the conduct criminally prohibited, it would have done so expressly. The Commonwealth offers no cases to the contrary.

The final weapon in the defense's arsenal, and perhaps the most telling one, is the Kentucky General Assembly's confirmation of legislative intent found in the Maternal Health Act of 1992. H.B. 192, Ch. 442, Kentucky Acts (1992). The Act is intended to provide a comprehensive plan to address the

threat to healthy childbearing caused by prenatal alcohol and drug abuse. The Preamble states the Act's purpose as follows:

"WHEREAS, *The General Assembly finds that a woman's ability to bear healthy children is threatened by the consequences of alcoholism and drug abuse;* as many as ten percent (10%) of all births in the Commonwealth may be affected by alcohol or drug abuse; drug and alcohol use during pregnancy can result in low birthweight, physical deformities, mental retardation, learning disabilities, and other health problems in newborn infants; fetal alcohol syndrome is the leading identifiable cause of mental retardation in the nation and the only one that is totally preventable; drug and alcohol impaired individuals pose extraordinary societal costs in terms of the medical, educational, and support services needed throughout the individual's lifetime; *education and treatment are essential strategies in preventing prenatal exposure to alcohol and other drugs;* pregnant substance abusing women face more barriers to substance abuse treatment than other persons seeking treatment; adequate prenatal care is an essential element in delivering a healthy, well-developed newborn; *punitive actions taken against pregnant alcohol or substance abusers would create additional problems, including discouraging these individuals from seeking the essential prenatal care and substance abuse treatment necessary to deliver a healthy newborn;* and

WHEREAS, the General Assembly *finds it is necessary to treat the problem of alcohol and drug use during pregnancy solely. as a public health problem* by seeking expanded access to prenatal care and to alcohol and substance abuse education and treatment programs." [Emphasis added.]

The Act then provides remedial measures to address these maternal health concerns by amending seven different Chapters of the Kentucky statutes to "treat the problem of alcohol and drug abuse during pregnancy solely as a public health problem (*supra*)." It provides for criminal punishment as a deterrent in only one instance: The Maternal Health Act amends KRS 218A.990 covering penalties for those found guilty of trafficking in or possessing drugs, to add a new subparagraph as follows:

"(19) Any person who traffics in a controlled substance classified in Schedules I, II, III, IV or V to any person who is pregnant shall be guilty of a felony and shall be punished by confinement in the penitentiary for not less than five (5) years nor more than ten (10) years, or be fined not less than ten thousand dollars ($10,000) nor more than twenty thousand dollars ($20,000), or both. Each violation shall constitute a separate offense."

We can only conclude the fact KRS 218A.990 was amended to provide special punishment for the dealer who supplies drugs to a pregnant person, but not to punish the woman on the basis that she takes drugs while pregnant, that the General Assembly intends no additional criminal punishment for the pregnant woman's abuse of alcohol and drugs apart from the punishment imposed upon everyone caught committing a crime involving those substances. Welch's possession of the drugs which she took is a punishable offense, but her punishment is not enhanced because she is pregnant, nor is she to be punished for injurious results to the baby. We would have to deliberately ignore the legislative purpose and the legislative approach specified in H.B. 192 to accept the Commonwealth's present argument that the General Assembly intended to use the deterrent effect of the criminal child abuse statutes as an additional approach to the self-abuse problem.

The defense makes a further argument to the effect that public health experts are uniformly of the opinion that including drug and alcohol self-abuse by the mother within criminal child abuse statutes is counterproductive; that these experts unanimously oppose prosecution for prenatal abuse. The difficulty in pursuing this argument is that it is grounded in literature which should have been presented at the trial level, and there identified as authentic and reliable, to bring the literature within the scope of the record before us. The extent to which an appellate court can or should rely upon material of this

nature as persuasive or authoritative when it has not been introduced at the trial level has been a troublesome question ever since the practice originated with the Brandeis Brief in *Muller v. Oregon*, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551 (1908). We will not address it here, not even by sidestepping the issue with a footnote as courts are wont to do. There is no need to because in H.B. 192 the Preamble establishes that the General Assembly has already absorbed the literature and made its decision to take the maternal health approach rather than to use the criminal sanction approach as a deterrent. It is abundantly clear that if the General Assembly considered the criminal child abuse statutes as part of the solution, it would have specified abuse of a child in a prenatal state in the original statutes expressing the elements of the offense, or, at the least, done so when it chose to address the entire problem with multiple statutory amendments in the 1992 Act "relating to maternal health."

For the foregoing reasons, the decision of the Court of Appeals is affirmed.

STEPHENS, C.J., REYNOLDS and SPAIN, JJ., and KATHRYN BURKE, Special Justice, concur.

WINTERSHEIMER, J., dissents by separate opinion in which LAMBERT, J., joins.

WINTERSHEIMER, Justice, dissenting.

I respectfully dissent from the majority opinion because it does not accept the concept of an unborn child as a human being who should be given legal protection.

The majority opinion states that the baby was born full-term, without birth defects, and that his size and weight were appropriate for his gestational age. However, my review of the record indicates that at the time of delivery, the doctors discovered meconium staining of the amniotic fluid and admitted the child to the neonatal intensive care nursery. He developed neonatal abstinence syndrome which occurs as a result of passive addiction to drugs by exposure to drugs through the mother during pregnancy. Upon severance of the umbilical cord, the drug supply was ended. The child was found to have a fever, was very irritable and cried a great deal. He was tremulous, jittery and could not sleep well. His skin was mottled because the nervous control of the blood vessels in his skin was disturbed. The majority opinion states the baby was released in good health.

The majority opinion imprecisely frames the legal issue as "whether the criminal abuse statute applies to the present fact situation" and concludes that it does not. In so doing, the majority has simply rewritten the statute. At oral argument, the issue developed as to where we should draw the line. In my view, the line should be drawn where the activities of one human being cause injury or abuse to another human being. As KRS 500.080(12) defines a person as a "human being," and KRS 508.110 defines criminal abuse in the second degree as wantonly abusing another person or permitting another person of whom he has actual custody to be abused, there is little doubt that the condition of the child at birth was caused by exposure to drugs which could have resulted in a cessation of breathing which could have resulted in permanent brain damage or death.

Recent majority decisions of this Court with which I fully disagree appear to indicate that what it calls a fetus is not a person. *Hollis v. Commonwealth*, Ky., 652 S.W.2d 61 (1983), and *Jones v. Commonwealth*, Ky., 830 S.W.2d 877 (1992). Despite this, all standard dictionary definitions define the term "person" as a human being. Civil law has long recognized that an unborn child is a person. 42 Am.Jur.2d *Infants* § 2 states that biologically speaking, the life of a human being begins at the moment of conception in the mother's womb, and as a general rule of construction in the law, a legal personality is imputed to an unborn child for all purposes which would be beneficial to the infant after birth. Prosser's 4th Edition, published in 1971, summarizes the law to the effect that medical authority has long recognized that the child is in existence from the moment of conception. All of the above views, as well as an extended discussion of the subject, can be found in my concurring opinion in *Jones v. Commonwealth*, supra. See also my dissent in *Hollis, supra.*

The majority opinion, however, grasps at other sources for its authority and shrewdly builds on *Hollis* and *Jones* to reach the legal conclusion that criminal law does not protect the child who is born alive and suffers withdrawal effects of drugs consumed by the mother during pregnancy.

I must fully agree, as I did originally, with Justice Lambert's concurring opinion in *Jones*, when he said in part:

> We should hold that a viable fetus enjoys full protection of the criminal law and that the terms "person" and "human beings" include viable unborn children.

It is not the prerogative of this Court to rewrite a criminal statute and it is not our prerogative to refuse application of the statute because we disagree with its reach. Such are matters of legislative prerogative and unless constitutional rights are thereby violated, this Court has no business fretting, as has the majority, over whether a pregnant woman could be prosecuted if she ingested alcohol, nicotine, prescription and non-prescription painkillers, or engaged in dangerous sporting activities. The majority has interjected the foregoing false issue as a means of justifying its refusal to apply a statute which was clearly violated by appellee's injection of cocaine into her jugular vein when she was eight months pregnant.

It is with great sadness and disappointment that I am forced to conclude that in Kentucky the majesty of the law is unable or unwilling to protect innocent unborn children from harm caused by the conduct of another human being.

LAMBERT, J., joins this dissenting opinion.