COMMONWEALTH OF KENTUCKY,
Appellant,

v.

Christopher Charles MORRIS,
Appellee.

No. 2002–SC–0845–DG.

Supreme Court of Kentucky.

June 17, 2004.

Rehearing Denied Sept. 23, 2004.

Gregory D. Stumbo, Attorney General, Matthew D. Nelson, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellant.

Stephen W. Owens, Pikeville, Counsel for Appellee.

Francis J. Manion, American Center for Law and Justice–Midwest, Geoffrey R.

Surtees, Center for Law and Justice for Catholics United for Life, New Hope, Counsel for Amicus Curiae American Center for Law and Justice.

Robert C. Cetrulo, Northern Kentucky Right to Life, Covington, Counsel for Amici Curiae Northern Kentucky Right to Life; and Kentucky Coalition for Life.

COOPER, Justice.

On March 15, 2001, Troy Thornsberry and his pregnant wife, Veronica Jane Thornsberry, were en route to Pikeville Methodist Hospital for the anticipated birth of their unborn child when their vehicle was struck by a pickup truck operated by Appellee, Christopher Charles Morris. Mr. Thornsberry was injured in the collision; his wife and unborn child were killed. A post-mortem examination revealed that the child was a viable fetus who would have been born a healthy baby girl had she not sustained a fatal brain injury in the collision.[1]

A Pike County grand jury indicted Appellee for one count of assault in the first degree, KRS 508.010(1)(b), for causing Mr. Thornsberry's injuries, and two counts of wanton murder, KRS 507.020(1)(b), for causing the deaths of Mrs. Thornsberry and her unborn child. When the Pike Circuit Court refused to dismiss the charge pertaining to the death of the unborn child, Appellee accepted a plea offer pursuant to which he entered guilty pleas to reduced charges of assault in the second degree, KRS 508.020(1)(c), and manslaughter in the second degree, KRS 507.040(1)(a), with respect to the injury of Mr. Thornsberry and the death of Mrs. Thornsberry, and a conditional guilty plea to manslaughter in the second degree with respect to the death of the unborn child.

RCr 6.16; RCr 8.08; RCr. 8.09. He was sentenced to concurrent terms of ten years in prison for each conviction and appealed only the conviction arising from the death of the unborn child.

The Court of Appeals reversed, holding that the common law "born alive" rule, which *Hollis v. Commonwealth,* Ky., 652 S.W.2d 61 (1983), had applied to the homicide offenses defined in KRS Chapter 507 of the Kentucky Penal Code, precluded a homicide conviction for killing an unborn child. We granted discretionary review to reconsider *Hollis.*

The Commonwealth presents two arguments: (1) that the "born alive" rule has been superseded by the statutory definition of "human being" in the abortion statutes, *i.e.,* KRS 311.720(6), *viz:* " 'Human being' shall mean any member of the species homo sapiens from fertilization until death;" or, in the alternative, (2) that the "born alive" rule is an anachronism that should not be applied when the victim is a viable fetus. Because the rationale for the "born alive" rule no longer exists, we agree that the rule should be discarded. We hold that the felonious killing of a viable fetus can be prosecuted as a homicide under Chapter 507 of our penal code. However, because Due Process precludes retrospective application of that holding, we are required to affirm the result reached by the Court of Appeals.

## I. "BORN ALIVE."

The earliest commentator on the common law of England suggested that the killing of a fetus, or at least a "quickened" fetus, was a homicide.

> If there be anyone who strikes a pregnant woman or gives her a poison

---

1. The parties stipulated for purposes of this appeal that "[i]t is anticipated that the infant would have experienced a successful delivery given the medical information known to the parties."

whereby he causes an abortion, if the foetus be already formed or animated, especially if it be animated, he commits homicide.

III Henry de Bracton, *The Laws and Customs of England*, ii., 4 (*circa* 1274), as translated from the original Latin into English by Cyril C. Means, Jr., *The Law of New York Concerning Abortion and the Status of the Foetus, 1660—1968: A Case of Cessation of Constitutionality*, 14 N.Y.L.F. 411, 419 (1968). Bracton cited no authority for his proposition[2] and it was not followed in two subsequent anonymous cases before the King's Bench during the reign of Edward III. In the first case, reported in Year Book Michaelmas (Y.B.Mich.), 1 Edw. 3, f. 23, pl. 18 (1327) and dubbed *The Twinslayer's Case* by Professor Means, the accused supposedly had beaten a woman who was in the advanced stages of pregnancy with twins. One of the twins died in the womb. The other was born alive but died shortly thereafter, allegedly as a result of the beating. The accused was acquitted of killing both twins. Means, *The Phoenix of Abortional Freedom*, supra note 2, at 337 (providing English translation of original French text). The holding with respect to the twin who was born alive but later died was subsequently rejected by Coke, *infra*, and by later English courts. *Rex v. Senior*, 1 Moody 346, 168 Eng. Rep. 1298 (Cr.Cas.Res.1832); *Regina v. West*, 2 Cox's Cases in Crim. L. 500 (Nottingham Spring Assizes 1848). *See also Jones v. Commonwealth*, Ky., 830 S.W.2d 877, 878–

79 (1992) (conviction of manslaughter in the second degree affirmed where victim was born alive but subsequently died of injuries inflicted *in utero* ).

The second case rejecting *sub silentio* Bracton's proposition was reported by Sir Anthony Fitzherbert in *Graunde Abridgement*, tit. *Corone*, f. 268, pl. 263 (1st ed. 1516), f. 255, pl. 263 (3d ed. 1565) (Y.B. Mich., 22 Edw. 3 (1348)), and dubbed *The Abortionist's Case* by Professor Means. The accused was charged with killing a child in its mother's womb but was acquitted partially because "it is difficult to know whether he killed the child or not." Means, *The Phoenix of Abortional Freedom*, supra note 2, at 339. Thus, " '[i]f the child be destroied in the mothers belly, the destroier is no manslayer, nor Felone.' " *Id.* at 342 (quoting William Lambarde, *Eirenarcha, or of The Office of the Justices of the Peace* 217–18 (2d ed. 1582)). The reason for the rule was "*non constat* [it could not be established], whether the child were living at the time of the batterie or not, or if the batterie was the cause of death." *Sims's Case*, Gouldsborough 176, pl. 110, 75 Eng. Rep. 1075 (K.B.1601).

Coke's now-famous enunciation of the "born alive" rule is as follows:

> If a woman be quick with childe, and by a Potion or otherwise killeth it in her wombe; or if a man beat her, whereby the childe dieth in her body, and she is delivered of a dead childe, this is a great misprision, and no murder: but if the childe be born alive, and dieth of the

---

**2.** The absence of any citation to authority was noted by Justice Mosk in *Keeler v. Superior Court*, 2 Cal.3d 619, 87 Cal.Rptr. 481, 470 P.2d 617, 626 n. 4 (1970), *superseded by statute as stated in People v. Carlson*, 37 Cal. App.3d 349, 112 Cal.Rptr. 321, 324–25 (1974). Professor Means later reported that "[t]he sagacity of this insight was confirmed for me by the leading living authority on Bracton, Professor Samuel Thorne, of the

Harvard Law School, who remarked, when I drew Justice Mosk's statement to his attention, 'When Bracton had cases to support his view, he cited them.' " Cyril C. Means, Jr., *The Phoenix of Abortional Freedom: Is a Penumbral or Ninth–Amendment Right About to Arise from the Nineteenth–Century Legislative Ashes of a Fourteenth–Century Common–Law Liberty?*, 17 N.Y.L.F. 335, 354–55 (1971).

Potion, battery, or other cause, this is murder: for in law it is accounted a reasonable creature, in rerum natura, when it is born alive.

Sir Edward Coke, *Third Institute* 50–51 (1644).[3] The rule was repeated in later British treatises. 1 William Hawkins, *Treatise of the Pleas of the Crown*, ch. 31, § 16, at 80 (1716); Matthew Hale, *History of the Pleas of the Crown* 433 (1736); 1 William Blackstone, *Commentaries* 129–30 (1765).

The "born alive" rule is reported to have first been applied in the United States in *Commonwealth v. McKee*, 1 Add. 1 (Pa. 1791). *See* Clarke D. Forsythe, *Homicide of the Unborn Child: The Born Alive Rule and Other Legal Anachronisms*, 21 Val. U.L.Rev. 563, 598 (1987). Prior to legislative reform, it was almost universally applied. *See Commonwealth v. Booth*, 564 Pa. 228, 766 A.2d 843, 849 (2001), and cases cited therein. The rule continued to be one of necessity. As late as the nineteenth century, prior to quickening, "it was virtually impossible for either the woman, a midwife, or a physician to confidently know that the woman was pregnant, or, it follows, that the child *in utero* was alive." Forsythe, *supra*, at 573. Hence, there was no evidence of life until quickening. *Id.* Even quickening did not constitute proof that the fetus was alive at any particular moment thereafter. The health of a fetus could not be determined until after its birth. *Id.* at 575. "As a result, live birth was required to prove that the unborn child was alive and that the material acts were the proximate cause of death, because it could not otherwise be established if the child was alive in the womb at the time of the material acts." *Id.*

The "born alive" rule first entered Kentucky's jurisprudence in the pre-penal code case of *Jackson v. Commonwealth*, 265 Ky. 295, 96 S.W.2d 1014 (1936).

"[I]n order to establish the corpus delicti, in a case of infanticide, it must also be established that the child was born alive. In the absence of proof that the child had ever breathed or was alive at birth a conviction can not be sustained. It is necessary for the Commonwealth to prove affirmatively, not only that the child had breathed, because that might occur during birth, but that it had had a complete and separate existence of its own after birth. Being born means that the whole body is brought into the world, and it is not sufficient that the child breathes in the progress of the birth. But if a child is fully brought forth from the body of its mother, and is killed while still connected by the umbilical cord, it is murder. When the evidence that the child was born alive is susceptible of doubt, a conviction can not be sustained."

*Id.*, 96 S.W.2d at 1014–15 (emphasis added) (quoting James M. Roberson, *New Kentucky Criminal Law and Procedure* § 425 (2d ed.1927)). *Jackson*, a murder case, held that the Commonwealth had established the *corpus delicti* through "[t]he testimony of the physicians, together with that of the accused ...." *Id.* at 1016. Thus, as first applied in Kentucky, the "born alive" rule pertained to the sufficiency of the evidence needed to support a conviction of homicide, not the interpretation of a statute. *See also* Forsythe, *supra*, at 586 (The "born alive" rule "is recognized to be an evidentiary principle that was required by the state of medical science of the day.").

---

**3.** Professor Means credits Coke's reference to a "great misprision" with breathing life into Bracton's allegedly discredited dictum that an abortion after quickening was a homicide. Means, *The Phoenix of Abortional Freedom*, *supra* note 2, at 346–49.

## II. HOLLIS.

When *Jackson* was decided, murder was a common law offense and only the penalty was prescribed by statute. KS § 1149 (repealed 1942 Ky. Acts, ch. 208, § 2). Involuntary manslaughter (which now includes the offense of manslaughter in the second degree) was also a common law offense [4] but had no statutorily prescribed penalty, so was thus a misdemeanor punishable only by fine and/or confinement in the county jail. KS § 1127 (repealed 1942 Ky. Acts, ch. 208, § 2); *Cottrell v. Commonwealth*, 271 Ky. 52, 111 S.W.2d 445, 448 (1937); *Spriggs v. Commonwealth*, 113 Ky. 724, 68 S.W. 1087, 1088 (1902). Upon the adoption of the Kentucky Penal Code, effective January 1, 1975, common law offenses were abolished and all offenses, including homicides, were thereafter to be defined by statute. KRS 500.020(1).

KRS 507.040 provides, *inter alia:*

(1) A person is guilty of manslaughter in the second degree when he wantonly causes the death of *another person* including, but not limited to, situations where the death results from the person's:

(a) Operation of a motor vehicle . . . .

(Emphasis added.) Similarly, the murder statute, KRS 507.020, refers to causing the death of "another person." KRS 500.080 has always provided that, "[a]s used in the Kentucky Penal Code," " 'person' means a human being . . . ." KRS 500.080(12). Likewise, KRS 507.010, titled "Definitions," has always provided:

A person is guilty of criminal homicide when he causes the death of *another human being* under circumstances which constitute murder, manslaughter in the first degree, manslaughter in the second degree, or reckless homicide.

(Emphasis added.)

*Hollis v. Commonwealth,* supra, like *Jackson,* was a murder case that, like the case *sub judice,* involved the killing of a proven viable fetus. Because the fetus was killed before it was "born alive," *Hollis* held that a homicide had not been committed. *Id.* at 64–65. In interpreting KRS 507.020,[5] the plurality opinion in *Hollis* first inaccurately reported that "[t]he statute makes no effort to define the word 'person . . . .' " *Id.* at 63. *But see* KRS 500.080(12) which, by its very language, applies to all penal code offenses, and KRS 507.010. The opinion then reasoned that in the absence of a statutory definition, the General Assembly would be presumed to have intended to retain the common law definition of "person," which the opinion then concluded was the "born alive" rule adopted in *Jackson. Hollis, supra,* at 63. The concurring opinion in *Hollis* rejected this flawed statutory construction but nevertheless concluded that the holding in *Jackson* had survived the abolition of common law homicide offenses.

*Jackson, supra,* had not been overruled when the act was committed by Hollis. I believe he was entitled to rely upon the decisions of this court which had not been repudiated.

*Id.* at 65 (Vance, J., concurring).

We do not know why the *Hollis* plurality chose to ignore the existence of KRS 500.080(12) and KRS 507.010, both of which define "person" as "a human being,"

---

4. Involuntary manslaughter did not become a statutory offense until 1962. KRS 435.022 (enacted 1962 Ky. Acts, ch. 90, §§ 1, 2, repealed 1974 Ky. Acts, ch. 406, § 336, eff. Jan. 1, 1975).

5. Although the *Hollis* plurality construed KRS 507.020, not KRS 507.040, the statute at issue here, "person" cannot logically be construed one way under the statute proscribing murder and another way under the statute proscribing manslaughter in the second degree.

and instead employed a common law evidentiary requirement as the definition of "person." Remember, *Jackson, supra,* had not applied the "born alive" rule as a definition but as the proof required to establish the *corpus delicti* of the common law offense of murder. *Id.,* 96 S.W.2d at 1014. Perhaps the *Hollis* plurality had its eye on the definition of "human being" in the abortion statutes, *supra.* Although the effective date of KRS 311.720(6) was April 7, 1982 (1982 Ky. Acts, ch. 342, § 2), and *Hollis* was rendered on March 30, 1983, the offense in *Hollis* occurred prior to the enactment of the abortion statutes, thus precluding the application of KRS 311.720(6) to that case. *See* the discussion of the Ex Post Facto Clause in Part V, *infra.* However, the *Hollis* plurality may have concluded that by construing "person" instead of "human being," it could avoid a potential future argument, such as the one advanced here by the Commonwealth, that KRS 311.720(6) abrogated the common law interpretation applied in *Hollis.*

By construing "person" instead of "human being," the *Hollis* plurality also may have intended to deflect attention away from the fact that the drafters of the Kentucky Penal Code did not adopt the definition of "human being" espoused in the Model Penal Code (MPC) *i.e.,* "a person who has been born and is alive." MPC § 210.0(1). As noted by the *Hollis* plurality, 652 S.W.2d at 63, the MPC influenced the drafters of the homicide provisions of the Kentucky Penal Code. *See* KRS 507.020–.040 (1974 Commentary).[6] *See generally* Robert G. Lawson, *Criminal Law Revision in Kentucky: Part I— Homicide and Assault,* 58 Ky. L.J. 242 (1969–70). Nevertheless, the drafters did

not adopt the MPC's definition of "human being" which, as suggested by the dissent in *Hollis,* provides some evidence of a legislative intent *not* to incorporate the "born alive" rule into our penal code. *Id.* at 67 (Wintersheimer, J., dissenting). Remarkably, the *Hollis* plurality cited the Comment to the MPC's definition of "human being" for the proposition that the drafters of the Kentucky Penal Code *did* intend to retain the "born alive" rule. *Id.* at 63 (quoting MPC § 210.1 cmt. 4(c)).

### III. VIABLE FETUS.

Medical science has now advanced to the stage that the viability, health, and cause of a fetus's death can be determined. *See* Mary Lynn Kime, *Hughes v. State: The "Born Alive" Rule Dies a Timely Death,* 30 Tulsa L.J. 539, 543 (1995); Stephanie R. McCavitt, Note, *The "Born Alive" Rule: A Proposed Change to the New York Law Based on Modern Medical Technology,* 36 N.Y.L. Sch. L.Rev. 609, 636–37 (1991). Thus, the rationale for the "born alive" rule no longer exists. *Hughes v. State,* 868 P.2d 730, 732 (Okla.Crim.App.1994). Specifically, there is no need for it in the case *sub judice* because the post-mortem examination clearly proved that the unborn victim was a viable fetus who would have been born alive and completely normal except for the fatal brain injury sustained in the vehicular collision caused by Appellee. To quote Justice Holmes:

> It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.

**6.** The Commentaries cite a tentative draft of the MPC from 1959 that is numbered differently from the final draft completed in 1962. The sections from the tentative draft cited in the Commentaries accompanying KRS 507.020–040 are numbered from 201.2–.3. However, the corresponding sections in the final draft are sections 210.1–.4.

Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L.Rev. 457, 469 (1896–97).

The more enlightened cases have departed from the "born alive" rule in favor of recognizing that a viable fetus can be the victim of a homicide. *See, e.g., Commonwealth v. Cass*, 392 Mass. 799, 467 N.E.2d 1324, 1325–26 (1984) (viable fetus is a "person" under a vehicular homicide statute criminalizing causing the death of "another person"); *Hughes v. State, supra*, at 731 (viable fetus is a "human being" under statute defining homicide as the killing of a "human being"); *State v. Horne*, 282 S.C. 444, 319 S.E.2d 703, 704 (1984) (viable fetus is a "person" within statute defining murder as the killing of "any person"). Viability was recognized in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), as the "compelling" point at which "the fetus then presumably has the capability of meaningful life outside the mother's womb," and the earliest time at which a state may proscribe consensual abortions. *Id.* at 163–64, 93 S.Ct. at 732. It is also the point at which the killing of an unborn child gives rise to a civil cause of action for wrongful death on behalf of the unborn child's estate. KRS 411.130.

The most cogent reason, we believe, for holding that a viable unborn child is an entity within the meaning of the general word "person" is because, biologically speaking, such a child is, in fact, a presently existing person, a living human being. It should be pointed out that there is a definite medical distinction between the term "embryo" and the phrase "viable fetus." The embryo is the fetus in its earliest stages of development, but the expression "viable fetus" means the child has reached such a state of development that it can presently live outside the female body as well as within it. A fetus generally becomes a viable child between the sixth and seventh month of its existence, although there are instances of younger infants being born and surviving.

*Mitchell v. Couch*, Ky., 285 S.W.2d 901, 905 (1955) (citing William J. Cason, *May Parents Maintain an Action for the Wrongful Death of an Unborn Child in Missouri? The Case for the Right of Action*, 15 Mo. L.Rev. 211, 218 (June 1950)). *See also Rice v. Rizk*, Ky., 453 S.W.2d 732, 735 (1970). Whether a fetus was viable when killed is just as provable by competent evidence as whether a child was born alive or stillborn. *See Jackson*, 96 S.W.2d at 1016 ("The testimony of the physicians together with that of the accused, establishes beyond cavil, doubt, or question" that the child was born alive.).

■ It is inherently illogical to recognize a viable fetus as a human being whose estate can sue for wrongful death and who cannot be consensually aborted except to preserve the life or health of the mother, but not as a human being whose life can be nonconsensually terminated without criminal consequences. Thus, we overrule *Hollis* and hold that a viable fetus is a "human being" for purposes of KRS 500.080(12) and the KRS Chapter 507 homicide statutes.

## IV. THE ABORTION STATUTES.

The Commonwealth argues that the penal code's definition of "person" as "a human being" *ipso facto* requires application of the definition of "human being" in KRS 311.720(6) to the penal code. As noted *supra*, that statute defines "human being" as "any member of the species homo·sapiens from fertilization until death." However, while the introductory sentence in KRS 311.720 purports to apply the definitions enumerated therein to "KRS 311.710 to 311.820, *and laws of the Commonwealth unless the context otherwise requires*"

(emphasis added), the definition of "human being" was added to KRS 311.720 by an Act entitled, "AN ACT relating to abortion." 1982 Ky. Acts, ch. 342, § 2. Section 51 of our Constitution provides that "[n]o law enacted by the General Assembly shall relate to more than one subject, *and that shall be expressed in the title ....*" (Emphasis added.) Thus, the definition of "human being" set forth in KRS 311.720(6) cannot constitutionally be applied to the homicide provisions of the penal code. *Edwards v. Land,* Ky.App., 851 S.W.2d 484, 487 (1992) (if a portion of the Act falls within the scope of the title and another portion falls outside the scope of the title, the portion falling outside may be omitted), *overruled on other grounds by O'Bryan v. Hedgespeth,* Ky., 892 S.W.2d 571, 578 (1995).[7]

### V. THE FETAL HOMICIDE STATUTE.

House Bill 108, 2004 Gen. Assem., Reg. Sess. (Ky.2004), effective February 20, 2004 (nine days after the oral argument in this case), which became KRS Chapter 507A, created the new offense of "fetal homicide." The bill defines "unborn child" as "a member of the species homo sapiens in utero from conception onward, without regard to age, health, or condition of dependency." H.B. 108 § 1(c). The Ex Post Facto Clauses of both the United States and Kentucky Constitutions preclude retrospective application of this statute to Appellee's conduct with respect to the unborn child in this case. U.S. Const., art. I,

§ 10, cl. 1; Ky. Const. § 19(2). However, we are invited to use this case as a vehicle to prospectively adopt that definition via common law. (*See* Wintersheimer, J., concurring, *post.*) Of course, KRS 507.040, the statute we now construe, refers not to an "unborn child," but to a "person," further defined as "a human being." Since the human being that is the subject of this appeal was a viable fetus, it is unnecessary to address in this opinion whether killing a nonviable fetus would violate KRS 507.040. Presumably, future homicides of nonviable fetuses will be prosecuted under KRS Chapter 507A.

Furthermore, to prematurely approve the definition in H.B. 108 would preempt a potential "void for vagueness" challenge to the statute, essentially declaring it constitutional without benefit of either briefs or arguments.[8] It might also tempt an overly zealous prosecutor to cite such a holding in an attempt to apply the KRS Chapter 507 homicide statutes to a consensual abortion of a nonviable fetus, or to seek the death penalty for the double murder of a pregnant woman and her nonviable fetus, applications expressly precluded in the new fetal homicide law. H.B. 108, *supra,* at §§ 1(2), (3); 6.

### VI. THE "REENACTMENT DOCTRINE."

■ Justice Keller correctly notes the validity of the "reenactment doctrine" in his concurring opinion, *post.* " 'It is a generally recognized rule of statutory construction that when a statute has been

---

**7.** KRS 311.720(6) has also been declared unconstitutional as applied to abortions because it violates the directive in *Roe v. Wade, supra,* at 162, 93 S.Ct. at 731, that a state may not adopt a particular theory of life for the purpose of overriding the rights of the pregnant woman. *Eubanks v. Brown,* 604 F.Supp. 141, 144 (W.D.Ky.1984).

**8.** *Roe v. Wade, supra,* contains the statement that "[s]ubstantial problems for precise definition of this view [that life begins at conception] are posed, however, by new embryological data that purport to indicate that conception is a 'process' over time, rather than an event ...." *Id.* at 161, 93 S.Ct. at 730–31 (citing various medical texts and articles).

construed by a court of last resort and the statute is subsequently reenacted, the Legislature may be regarded as adopting such construction.'" *Hughes v. Commonwealth*, Ky., 87 S.W.3d 850, 855–56 (2002) (quoting *Commonwealth v. Trousdale*, 297 Ky. 724, 181 S.W.2d 254, 256 (1944)). However, the so-called "reenactment doctrine" does not require continued application of the "born alive" rule to our homicide statutes.

First, the lead opinion in *Hollis* was a plurality opinion joined by only three members of the Court. Two members concurred in result only and the remaining two members dissented. The two concurring members based their concurrence on the premise that *Jackson v. Commonwealth, supra*, "had not been overruled when the act was committed [and the defendant] was entitled to rely upon the decisions of this court which had not been repudiated." *Hollis*, 652 S.W.2d at 65 (Vance, J., concurring). Obviously, the two separately concurring members concluded that the adoption of the penal code had not abrogated the common law holding in *Jackson* that proof of the *corpus delicti* of a homicide required proof that the victim was "born alive." They did not join the plurality opinion's analysis of legislative intent with respect to the definition of "person" in KRS 507.020. *Id.* ("I do not believe it is necessary or proper to extend the opinion of this court to the other issues discussed in the [plurality] opinion, and for that reason I concur in the result only."). Thus, the *Hollis* plurality's construction of the word "person" in KRS 507.020 was not a holding of the Court to which the legislature would be deemed to have implicitly acquiesced when it subsequently amended and/or reenacted KRS 507.020 and KRS 507.040 without redefining the word "person."

Of course, our subsequent decision in *Jones v. Commonwealth, supra*, was a majority opinion. However, the holding in *Jones* was that a child who was born alive and subsequently died from injuries inflicted *in utero* was a "person" within the meaning of KRS 507.040. 830 S.W.2d at 878–79. That holding is not inconsistent with our holding in this case.

Furthermore, since the General Assembly had already twice defined "person" as "a human being" for purposes of the penal code and the homicide statutes in KRS 500.080(12) and KRS 507.010, and the *Hollis* plurality did not attempt to construe either of those statutes, the *Hollis* plurality opinion arguably did not affect the statutory definition of "person" in any respect. *Compare Blauner's Inc. v. City of Phila.*, 198 A. 889, 893, 330 Pa. 340 (1938) (common law definitions irrelevant where statute contains its own definition); *Kohn v. City of Phila.*, 151 Pa.Super. 635, 30 A.2d 672, 675 (1943) ("None of these cases [reciting common law definitions of 'sale'] has any relevancy here where 'sale' is defined by the ordinance."). Thus, the "reenactment doctrine" does not affect our decision to overrule *Hollis*.

## VII. "FAIR WARNING."

█ Just as the Ex Post Facto Clause precludes retrospective application of new legislation, *e.g.*, H.B. 108, to conduct that was not illegal when committed, the retrospective application by a court of an unforeseeable change in the common law or in the interpretation of a statute to the detriment of a criminal defendant violates the "fair warning" requirement of the Due Process Clause. U.S. Const. amends. V, XIV § 1.

A "fair warning" violation occurs "[w]hen a[n] ... unforeseeable state-court [sic] construction of a criminal statute is applied retroactively to subject

a person to criminal liability for past conduct, the effect [being] to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime." *Bouie v. City of Columbia,* 378 U.S. 347, 354–55, 84 S.Ct. 1697, 1703, 12 L.Ed.2d 894 (1964).... *See also Gall v. Parker,* 231 F.3d 265, 305–06 (6th Cir.2000) (detrimental application of new judicial interpretation of extreme emotional disturbance defense to conduct occurring when more favorable interpretation was in effect violated "fair warning" requirement). The "fair warning" requirement also applies to changes in common law principles that are " 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.' " *Rogers v. Tennessee,* 532 U.S. 451, 460–62, 121 S.Ct. 1693, 1699–1700, 149 L.Ed.2d 697 (2001) (state court's abolishment of common law "year and a day" rule did not violate "fair warning" requirement) (quoting *Bouie, supra,* at 354, 84 S.Ct. at 1697).

*Walker v. Commonwealth,* Ky., 127 S.W.3d 596, 603 (2004).

Thus, our decision to overrule *Hollis* and criminalize the killing of a viable fetus cannot be applied retrospectively to Appellee's conduct.[9] Accordingly, we affirm the result reached by the Court of Appeals, but for a different reason than expressed in its opinion.

LAMBERT, C.J.; GRAVES, and JOHNSTONE, JJ., concur.

9. In light of the enactment of HB 108, some might regard this entire exercise as a vain endeavor, since all future fetal homicides presumably will be prosecuted under new KRS Chapter 507A. However, should HB 108 not survive constitutional challenge, the decision in this case will attain future significance.

KELLER, J., concurs by separate opinion, with STUMBO, J., joining that concurring opinion.

WINTERSHEIMER, J., concurs by separate opinion.

KELLER, Justice, Concurring.

I vote to affirm the holding of the Court of Appeals because I agree with the majority opinion's ultimate holding that the Pike Circuit Court erred when it denied Appellee's motion to dismiss Count II of the indictment. I write separately, however, because I recognize that this case is *solely* about statutory interpretation, *i.e.,* whether a defendant can be liable for criminal homicide under KRS Chapter 507 for the killing of an unborn child. It is blackletter law that "[i]n the construction of statutes, the primary rule is to ascertain and give effect to the intention of the Legislature." [1] And, when interpreting a statute, we must assign it a *stable* meaning because "intent is what the legislative body that passed the act intended when it passed the act *at that point in time.*" [2] Accordingly, I disagree with the majority's prospective broadening of KRS Chapter 507 criminal homicide liability through its conclusion (a/k/a "judicial fiat") that medical advancements have changed the meaning of the word "person" in KRS Chapter 507 from what this Court previously found that the General Assembly intended it to mean when it enacted the Kentucky Penal Code three decades ago. In my view, the rules of statutory construction continue to compel the conclusion that a person who

1. *Moore v. Alsmiller,* 289 Ky. 682, 160 S.W.2d 10, 12 (1942).

2. RONALD BENTON BROWN & SHARON JACOBS BROWN, STATUTORY INTERPRETATION: THE SEARCH FOR LEGISLATIVE INTENT, § 2.4, at 14 (NITA 2002) (emphasis added and footnote omitted) [hereinafter BROWN & BROWN].

kills an unborn child has no criminal liability under KRS Chapter 507.

Two decades ago, the lead opinion in *Hollis v. Commonwealth*[3] properly observed that "[t]his Court cannot presume that the legislature intended to license us to expand the class of persons who could be treated as victims of criminal homicide in our own discretion."[4] Accordingly, it turned to rules of statutory construction to determine *what meaning the General Assembly intended* for the word "person" in KRS Chapter 507, and it concluded that "persons" included all human beings who were born alive, but excluded the unborn, including viable fetuses.[5] Nine years later, in *Jones v. Commonwealth*,[6] a *majority* of this Court applied this same interpretation of "person" to a different factual situation, *i.e.*, one where a child born alive after the defendant's criminal conduct dies as a result of that conduct, and concluded that the defendant was liable for Second-Degree Manslaughter.[7] Until today, therefore, this Court has held that, for purposes of KRS Chapter 507, a "person" must be born alive. But today, despite the widely-held view that "[a] statutory construction, once made and followed, should never be altered upon the changed view of new personnel of the court[,]"[8] a majority of the Court consisting in part of new faces who were not on the Court when *Hollis* and *Jones* were decided, holds that medical advancements have made the Court's earlier interpretation obsolete and assigns a new meaning to the word "person" without even attempting to suggest that its interpretation corresponds to the enacting Legislature's intent.

In my view, the majority's evolutionary notion of statutory meaning runs afoul of the canons of statutory interpretation. In particular, I submit that subsequent General Assemblies have ratified the holdings of *Hollis* and *Jones*.

When a legislature reenacts an earlier statute, the normative view is that the legislature should have known how that statute had been interpreted and applied since its original enactment. If the legislature had disagreed with those interpretations, it should have expressed that disagreement by changing the statute to prevent courts and agencies from continuing to apply the statute incorrectly. Consequently, if the legislature reenacts the statute without rejecting the interpretations of the earlier act, it probably means to approve those interpretations.[9]

Significantly, in the twenty-one years that have elapsed since *Hollis* was rendered, the General Assembly has substantially reenacted both KRS 507.020,[10] the crime for which Appellee was indicted, and (twice) KRS 507.040,[11] the crime to which Appellee entered his conditional guilty plea, but has failed to make any changes

---

**3.** Ky., 652 S.W.2d 61 (1983).

**4.** *Id.* at 63.

**5.** *Id.* at 62.

**6.** Ky., 830 S.W.2d 877 (1992).

**7.** *Id.* at 880.

**8.** 73 Am. Jur. 2d *Statutes* § 63 (2001).

**9.** *Id.* at § 9.3.1, 149–50 (footnote omitted). See also *Commonwealth v. Vincent*, Ky., 70 S.W.3d 422, 425 (2002); *Falender v. Hankins*, 296 Ky. 396, 177 S.W.2d 382, 383 (1944) (observing that it is a "well-settled rule of statutory construction, that when a statute or clause, or provision thereof, has been construed by the court of last resort of a state, and the statute has been substantially re-enacted, the Legislature will be deemed to have adopted such construction.").

**10.** *See* 1984 Ky. Acts. ch. 165, § 26.

**11.** *See* 2000 Ky. Acts. ch. 521, § 8; 1984 Ky. Acts. ch. 165, § 27.

to KRS Chapter 507 that would have changed the meaning of "person" that *Hollis*—and later, but prior to the most recent reenactment of KRS 507.040, *Jones*—found applicable to Kentucky's criminal homicide provisions.

To interpret the statutes at issue here, however, we do not have to rely upon rules of construction that merely assume the legislature "should have known" or "must have known" about this Court's previous interpretation of "person." The 2004 General Assembly's "ACT relating to the protection of unborn children and declaring an emergency," which created *separate fetal homicide offenses* for causing the death of an unborn child and became law when it was signed by the Governor on February 20, 2004, expressly states that the General Assembly interprets the existing provisions of the Kentucky Penal Code not to provide criminal liability for the killing of an unborn child: *"Whereas current criminal law leaves unborn children outside of its coverage, and unborn children are in dire need of that coverage,* an emergency is declared to exist and this Act shall take effect upon signature of the Governor or upon its otherwise becoming law." [12] Although Justice Wintersheimer, in his concurring opinion, believes the 2004 General Assembly's fetal homicide legislation supports his conclusion that the killing of an unborn child is actionable under KRS Chapter 507, I believe the exact opposite to be true. Possible constitutional challenges to House Bill 108 notwithstanding, it is *the fact that the fetal homicide legislation was enacted at all* that cements my conclusion that KRS Chapter 507 criminal homicide liability is unavailable for the killing of an unborn child. This was expressly recognized by the 2004 General Assembly in enacting fetal homicide legislation. What better expression of the General Assembly's intent is there than their own words.

Just last year, in *Kotila v. Commonwealth*,[13] this Court held that its interpretation of Manufacturing Methamphetamine under KRS 218A.1432(1)(b) was "supported by the General Assembly's own subsequent enactments with respect to the possession of chemicals used in the manufacture of methamphetamine." [14] In doing so, the Court recognized that the presumption against redundant enactments allows a reviewing court to interpret the General Assembly's decision to prohibit certain conduct through its criminal laws as an indication that the conduct was not already prohibited by another, previously-enacted criminal statute.[15] It defies all logic, and creates serious potential double jeopardy quandaries, for this Court to interpret "causing the death of an unborn child" as criminal homicide under KRS Chapter 507 after the most-recent General Assembly has both made a legislative declaration that the existing provisions of the Penal Code (presumably including KRS Chapter 507) do not provide criminal liability for that conduct and has defined the conduct as a *different criminal offense* under a *different chapter of the Penal Code.*

Accordingly, I concur in the result reached by the majority because I believe Appellee was not subject to liability for criminal homicide under KRS Chapter 507 for causing the death of an unborn child. Unlike the majority, however, I maintain that no KRS Chapter 507 liability exists for any such conduct unless and until the

---

**12.** 2004 Regular Session, House Bill 108, § 6 (emphasis added).

**13.** Ky., 114 S.W.3d 226 (2003).

**14.** *Id.* at 238.

**15.** *Id.* at 238–39.

General Assembly enacts legislation that would provide for such liability.

STUMBO, J., joins this concurring opinion.

WINTERSHEIMER, Justice, Concurring.

I most certainly concur with the opinion of this Court in its decision to overrule *Hollis*. In that case, a plurality of this Court in 1983 determined that a viable unborn child is not a person under KRS Chapter 507, and that an unborn child must be "born alive" to constitute a person thereunder. *Hollis* reasoned that an individual who kills a viable unborn child cannot be charged with criminal homicide. Clearly, it was long past due to remove that holding from the jurisprudence of Kentucky.

I write separately in concurrence to state my views regarding the necessity of recognizing the ultimate legal logic and medical fact that necessarily arises from the adoption of a viability standard. "Viability" is a term of art, nonspecific, constantly changing, and medically and factually of some concern. "Viability" measures not the humanity of the unborn child, but of the life support capacity of our culture and society.

For almost a half a century, the law with respect to the rights of unborn children has been progressive and enlightened by the clear evidence developed in the sciences of medicine and biology. Except for certain superficial differences, there is no meaningful distinction between the unborn child with functioning but younger organs and another unborn child, a few days or weeks older with functioning slightly more advanced. There is no difference sufficient to justify granting greater consideration to the child in the later stages of development than the child in the earlier stages. There is no good reason why we should discriminate against unborn children and treat their cases any differently than those of any other human being.

Medical authority has long recognized that an unborn child is in existence from the moment of conception. Prosser and Keeton on Torts, § 55 "Prenatal Injuries" at 368 (5th Ed.1984); 42 Am.Jur.2d "Infants" § 3. Many jurisdictions have extended the standards in both civil and criminal cases to a definition which involves conception and/or fertilization.

A number of cases decided prior to *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), shed light on the difficulty of using viability to identify the beginning of a person's life. In *O'Neill v. Morse*, 385 Mich. 130, 188 N.W.2d 785 (1971), the court asked, "If the mother can die and the fetus live, or the fetus die and the mother live, how can it be said that there is only one life? .... The phenomenon of birth is not the beginning of life; it is merely a change in form of life." *Id.*, at 787. In *Porter v. Lassiter*, 91 Ga.App. 712, 87 S.E.2d 100 (1955), the court rejected viability and determined that the child's life begins when it is "quick", that is it moves in the mother's womb. Another court, in *Smith v. Brennan*, 31 N.J. 353, 157 A.2d 497 (1960) gave a lengthy review of the medical and legal history up to that point, and rejected viability as "impossible of practical application." They said, "[w]e see no reason for denying recovery for a prenatal injury because it occurred before the infant was capable of separate existence. in the first place, age is not the sole measure of viability, and there is no real way of determining in a borderline case whether or not a fetus was viable at the time of the injury..." *Id.* at 504; *accord Bennett v. Hymers*, 101 N.H. 483, 147 A.2d 108 (1958).

Justice O'Connor, in *Akron v. Akron Ctr. for Reproductive Health, Inc.,* 462 U.S. 416 at 457, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), noted that although viability was generally thought, in 1973, to be 28 weeks, ten years later, infants delivered at 22 weeks could survive. "[D]ifferent technological improvements will move *backward* the point of viability..." *Id.,* 462 U.S. at 456, 103 S.Ct. 2481. "It is certainly reasonable to believe that fetal viability in the first trimester of pregnancy may be possible in the not too distant future." *Id.,* at 457, 103 S.Ct. 2481. "The *Roe* framework, then, is clearly on a collision course with itself." *Id.,* at 458, 103 S.Ct. 2481. It may be easily said then that logic is in favor of ignoring the time in the pregnancy at which an injury occurs lest we place our criminal system on the same collision course.

In other pre-*Roe* civil cases, the U.S. District Court for the northern district of Ohio in *Steinberg v. Brown,* 26 Ohio Misc. 77, 321 F.Supp. 741 (D.C.Ohio 1970), observed that "biologically, when the spermatozoon penetrates and fertilizes the ovum, the result is the creation of a new organism which conforms to the definition of life ...." *Id.* at 746. It is true that there have been dramatic advances in medical science, and legislative enactments now require acknowledgement that the 'born alive' doctrine no longer serves any evidentiary purpose. However, it can easily be argued that viability is difficult to apply. As noted by the *Steinberg* panel, "Once human life has commenced, the constitutional protections found in the Fifth and Fourteenth Amendments impose upon the state the duty of safeguarding it." *Id.* at 746–747.

It is of interest to note that the pattern of legislative intent by the Kentucky General Assembly can be seen in the adoption of KRS 311.720(6) wherein the legislature specified that the definition of human being as "any member of the species homo sapiens from fertilization until death" is applicable to the laws of the Commonwealth unless the context otherwise requires. The General Assembly has clearly indicated its intent that the term "human being" should have the broadest possible meaning so as to include an unborn child.

In effect, the legislature has abrogated the common law by adopting a definition that considers the unborn child as a human being from the moment of conception. *See* KRS Chapter 507A Section 1(c), which was enacted by the legislature and signed into law by the governor as emergency legislation on February 20, 2004. It could provide uniformity and stability by recognizing that the unborn child is, from conception onward, in medicine and biology, in logic and law, a person, and that the death of the unborn child by the wrongful act of a third person is actionable both civilly and criminally.

Prosecution of such behavior should be measured in the same way as all other questions of fact: 1) by introducing competent causation evidence established by a preponderance of the evidence in civil cases and beyond a reasonable doubt in criminal cases and, 2) having the case submitted to a jury just as any other factual dispute in our legal system. Unborn children should be treated in the same manner as other human beings.

Obviously, this Court cannot pass on the availability of the newly enacted criminal fetal homicide act. Such matters could be addressed only in a proper case under the new law.

A brief review of the scholarly writings and some of the pertinent cases may be helpful in understanding the history of the born alive doctrine in general, as well as the viability standard in particular. I would be remiss if I ignored the considera-

ble jurisprudence in the area of fetal homicide that I discovered in researching the questions raised.

For a valuable review and analysis for discarding both the requirements of viability and the born alive rule, *see* Michael Holzapfel, Comments, *The Right to Live, The Right to Choose, and the Unborn Victims of Violence Act*, 18 J. Contemp. Health L. & Pol'y 431 (2002). But commentaries as far back as 1968 have shown that viability is "impractical of application". Norman, *Torts: Prenatal Injuries—Liability and Live Birth*, 21 Okla. L.Rev. 114 (1968).

Since the decision of *Bonbrest v. Kotz*, 65 F.Supp. 138 (D.D.C.1946), our legal system has been steadily distancing itself from the reasoning of Justice Oliver Wendell Holmes who declared that a pregnant mother and her unborn child were a "single entity" in *Dietrich v. Inhabitants of Northhampton*, 138 Mass. 14 (1884). The "born alive" rule is disappearing from the face of American criminal jurisprudence. As the legislature has defined, the life within the mother begins at *fertilization*. See KRS 311.720(6). It is good to see that we have moved the common law underlying the legislation towards our goal of ensuring the protection of life for all Kentuckians.

"Viability" is a term of art that sets the legal recognition of a separate person's interests and rights to be distinct from the mother's as the time at which medical science can sustain the child's life apart from the womb. *Bonbrest, supra*, originally used this concept as a means of determining whether the unborn child had a wrongful death claim. The controversial decision of *Roe v. Wade, supra*, deeply rooted viability into abortion decisions because it used this point in the development of the unborn child to balance the interests of the mother with those of her unborn child. Viability depends on the medical establishment to tell the courts what they are able to do. But interest in cloning and the creation of an artificial womb can mean a possibility that someday viability may coincide with fertilization.

As a standard in the world of abortion, viability was adopted as the last point at which a mother could opt to abort the unborn child in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). But *Roe* and *Casey, supra*, inserted the clause "except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Casey*, 505 U.S. at 879, 112 S.Ct. 2791 (quoting *Roe*, 410 U.S. at 164–165, 93 S.Ct. 705). This "health of the mother" exception is used to justify abortions that are commenced beyond viability. An ordinary person might understand the words to mean that the unborn child may be killed because it poses a threat to the life of the mother. Justice Thomas argues the same in his dissenting opinion in *Stenberg v. Carhart*, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) and the majority said, "He is wrong." *See Stenberg*, 530 U.S. at 931, 120 S.Ct. 2597. Therefore, "Health" has been vastly enlarged. So, despite the so-called health exception, the concept of viability is the line dug in the sand for those people who discuss abortion. The *Roe* line of cases, however, deals with a mother and an unborn child. In this case, we are determining the rights of the unborn child and mother vis-á-vis criminal acts of others. Viability has nothing to do with whether the unborn child, or other nomenclature referring to the being created and set into independent motion at fertilization or conception, is recognized as a person with rights and privileges under the law.

In *Wiersma v. Maple Leaf Farms*, 543 N.W.2d 787 (S.D.1996), the South Dakota Supreme Court wisely distinguished between using viability as an abortion standard or as a criminal standard. Their purpose was to determine whether there are two separate lives existing in relation to third parties. It stated, "Nothing in *Roe* prohibits the Legislature from including a nonviable fetus in its definition of a person under our State's wrongful death act". *Wiersma*, 543 N.W.2d at 790, note 2. They distinguished fetal assault and homicide cases away from acts committed during abortion. Maple Leaf had argued that an inconsistency would be created by allowing a cause of action for the wrongful death of a nonviable fetus and at the same time allowing an abortion up to the 24th week of pregnancy. That court stated that if it accepted such an argument, "someone could fatally injure an unborn child by a nonconsensual, wrongful act and still avoid civil liability because the child was not yet viable. This would, ironically, give the tortfeasor the same civil rights as the mother to terminate a pregnancy." *Id.*, at 791. This analysis is clear and consistent with *Roe*, which allowed *the mother* to choose to abort the unborn child, but not anyone else, not even the father. Therefore, simple equity instructs that others who have less tenable rights than the father are estopped from using *Roe* as a shield from civil and criminal liability here because those interests sprung from the mother's unique position and the next closest to the mother, the father, does not qualify. Therefore, a third party cannot claim the same interests granted only to the mother. At least one other court has rejected Maple Leaf's type of argument and upheld the distinction on purpose. *See People v. Ford*, 221 Ill.App.3d 354, 163 Ill.Dec. 766, 581 N.E.2d 1189 (1991). ("A woman has a privacy interest in terminating her pregnancy; however, defendant has no such interest.").

For any purpose other than abortion, many jurisdictions have abandoned viability because it has no magic sense in identifying the beginning of a person's life. California, which has defined murder as the "unlawful killing of a human being, or a fetus, with malice aforethought", declined to use viability as an element of murder. There, the charge of murder will stand as long as the state can show that the unborn child was beyond the embryonic stage, that is, seven to eight weeks. *See People v. Davis*, 7 Cal.4th 797, 30 Cal.Rptr.2d 50, 872 P.2d 591 (1994). Other standards are fertilization and quickening. Quickening is a point prior to viability, somewhere between 16 and 18 weeks, when the mother feels the first movements of the child in her womb. Several states have used quickening as the point after which criminal actions for harm to the fetus may attach. But quickening is also only a waypoint from the true beginning of individual human life which is conception. Viability is a tool that can be used to expand the proper approach to ascertaining the legal and natural beginning of human life in the unborn child. The advances of medical science are limitless and can be easily applied to enlarge the viability concept to currently unknown dimensions, including fertilization and conception.

These movements away from born alive rules tend to place the beginning of life at its source, as proved by medical science, fertilization or conception. Louisiana, North Dakota, Missouri, and several others have had statutes defining a separate human life from fertilization or conception. The Federal Government has recently enacted the Unborn Victims of Violence Act (HR 1997). Our legislature passed KRS 311.720(6) with the definition of life begin-

ning at *fertilization.* We should put the force of the common law on similar footing.